Good morning. May it please the court. Sarah Varner for William Bell. I'll be sharing my time this morning with my co-counsel who addressed the arguments of Mr. Dixon. In order to be found guilty of second-degree murder, Mr. Bell must have formed a conscious intent to kill. In order to be found guilty of first-degree murder, Mr. Bell must have had this intent, plus he must have had an intent to kill. I think based on this court's ruling in Delaney in 2013 that what we're talking about is a policy judgment, that a crime that involves a period of reflection is a crime that just deserves greater punishment, but where the confusion begins, and honestly where it still is for me, is how long is that? When does it happen? What does it look like? Because the case law also tells us that premeditation can happen in an instant. Now this is further complicated by the fact that we're looking at a defendant's state of mind. But does the apparent concert of action between Mr. Bell and Mr. Dixon show premeditation? I don't think so, Your Honor. I think what we're looking at is not just a question of timing. We're looking at these detailed facts, and do those facts actually show that he did, in fact, premeditate? And what Your Honor is referring to and what the government relied on is basically the time that it took Mr. Bell to leave his cell and walk to the next cell. The government relies on the fact that Mr. Bell left his cell with a weapon, and he and Mr. Dixon left their cell together. And honestly, I think that fact is so sparse and so spare, like you can't infer anything from the fact that they left their cell together. Mr. Dixon sat down and appeared at one time to look towards cell 105. Well, he left cell 103. Well, Dixon left cell 103 just after Bell, who's now sitting outside of that cell, walked over to cell number 105, which was Pendleton's cell. He looked in the direction of cell 105 while Bell was there, and then he stood up, and he walked back into cell 103 as Bell walked back. That seems, Your Honor... You know, kept his... Bell walks to the cell, keeps his right hand in his pocket, opens up the cell door with his left hand. You know, there's a fair inference, is there not, that Bell was carrying the weapon in his right hand, which would, in turn, support an inference that he'd already decided to kill Pendleton. I think it is a fair inference that he left his cell with a weapon in his hand, but the question is, did he take time to premeditate the crime? And I think, you know, in preparing for this argument... Well, would it not be premeditation if he leaves his cell with a weapon in his... I don't think so. I think, you know, in preparing for this argument and reading case after case after case, I started to get into, like, a little bit of the, like, law school jitters, like, this could devolve into all kinds of what probably happened, what could have happened. But in imagining a person shows up somewhere with a weapon, that's not itself evidence of premeditation or felony murder wouldn't exist. If I went into a grocery store with a weapon... What would you have to do? What more would you have to do to show some sort of premeditation? On Mr. Bell's part, I believe that what we need, that these facts that... I think those are very sparse facts. I think what we don't have in this case is greater. And I think what we don't have in this case is any indication of planning activity. There's no testimony of them planning anything together. And a big black hole for me is there's no motive. There's no testimony by anybody saying that Mr. Bell or Mr. Dixon had ever had any interaction with Mr. Pendleton. There's nothing to suggest that there was a beef going on. There's nothing to suggest any motive. So in my mind, I think of, what if Mr. Bell did leave his... They exit the cell together and Mr. Dixon sits down. What if Mr. Bell does leave his cell with a weapon? But what if his intention is to go to Mr. Pendleton's and steal from him? We can't know based on these facts that he premeditated a murder. And the government makes much of the fact that he... They believe that he was lying down at the time that he was stabbed. But perhaps, you know, Dixon and Bell said, hey, Pendleton is asleep right now. Let's go in there and steal some things. You go and do it and I'll wait here. We don't have facts to assume that he contemplated murder at the time that he went into his cell. Perhaps Mr. Pendleton woke up. If you, going back to what Judge Rovner said, if you look at how they're working in concert, that certainly seems to imply that they are, that there is some plan. I think the evidence of them working in concert is so thin. And without those two other factors, evidence of them planning or evidence of a motive, there's just not enough here for us to say this is first degree. Did he form an intent to kill? I think he certainly did when he stabbed him, when he took a deliberate action of stabbing him in such an exacting kind of place that would cause very serious injury to any of us. But just on those bare facts that they left the cell together, that I don't think that trying to conceal the crime is evidence that they premeditated. So the only evidence, really, that they acted in concert is that he left, that they left the cell together and Mr. Dixon sat down and looked once in the direction of the cell where this was going on. Of course... They came back together. You could also interpret it a different way, however, that they had planned it, that this was all done in concert and the attempt to conceal was all laid out, which would support entire premeditation. We could, Your Honor, but our position is that those facts are so small that without this other evidence there was no basis for a reasonable jury to find beyond a reasonable doubt that this crime was premeditated. And I believe I'm reaching the end of my time. Well let me ask you, we have somebody leaves the cell with an illegal weapon and his cellmate knows he's got the illegal weapon. Your claim is that they went there and he just let him go in to steal something? Well that's just a, like let's imagine a probability, like a thought experiment, because we can't know based on these few facts what happened. Well one, we don't know. There's no evidence that Dixon knew he had the weapon. All we know is they come out together and there's no evidence at all to say that Dixon knew Bell had the weapon. All we know is they come out, Dixon sits down, Bell goes to Pendleton's cell. So my imagining is, let's imagine they just had a plan to steal instead, on these same facts. And perhaps Pendleton woke up and gets stabbed at that point. And all of that is just simply to say, I don't know that's what happened, maybe he had a plan to just confront him. We have to just stay limited to the facts in the case to show, do these facts alleged by the government without showing any planning. So if he went to steal something, what was the purpose of carrying the weapon? Well I think in prison, carrying a weapon to steal something would probably be a normal course of activity. And doing what with it? To protect himself. I mean, I think of it like felony murder. Like I go into a grocery store, I'm carrying a gun, I'm planning to steal. I might not be planning to kill, just the fact that I'm carrying a gun into the store doesn't mean that I've premeditated a murder. And I believe my time has expired. I'll give you some more time. I'll give you a minute. Now or on rebuttal? I'll take it now. May it please the court, Mr. McCoskey. Jessie Cook on behalf of Leonard Dixon. A criminal defendant's right to be present at trial free of shackles springs from the presumption of innocence. If a defendant is presumed to be innocent, he must be allowed the indicia of innocence. And shackling is innocent. It is inconsistent both with the indicia of innocence and with our basic concept of justice. Now, of course, there's, you know, a table skirt was used to conceal the leg restraints. And there's no suggestion, it seems to me, that the jury was in someone able to notice or discern that Dixon was restrained. So how would he have been prejudiced? Well, we don't contend that the jury was aware of the shackling. But none of the courts in this circuit or the other circuits have ever held that just because shackling is inconspicuous or not done in the presence of the jury, that the evidentiary hearing as to the necessity of shackling is somehow not required. I think the situation is analogous to pretrial detention. Pretrial detention is a restraint on a person who's accused liberty. It's inconsistent with the presumption of innocence. But it's necessary, and courts approve of it, where it's necessary to ensure protection of the community and an appearance. In this situation, as in other cases involving the shackling of the defendant, distinguishable from the shackling of witnesses, we have a further restraint on an accused person's liberty, inconsistent with the presumption of innocence. And therefore, there is a requirement that the district court hold an evidentiary hearing and make a determination of necessity. But wasn't that done in this case? In this case, the court did hold the evidentiary hearing. The defendant requested such a hearing, but it's our contention that the district court abused its discretion in finding that in this specific case, shackling was necessary. The government's first request... There's no indication in the record that the jury had any idea that either defendant was shackled. But now you're saying in some way that that was an error, because the court came to the wrong decision, in your opinion? Yes. The standard is abuse of discretion. And this court, in the 2001 Walker case, was troubled by the fact that in that case, a witness whose shackling was not apparent was shackled during the course of the trial. And in that case, this court held that it was quite possible that the use of shackles was an error, despite the fact that the jury didn't witness that shackling. They didn't hold that there was an error because there was no objection, and therefore it wasn't a plain error. In this case, the government initially... Was that witness in custody as well? Yes. Yes, the witness was in custody. But of course, there's a real distinction between the shackling of witnesses in front of a jury, even if they see it, because that may impinge on their credibility, but it certainly doesn't impinge to the same degree on the defendant's, on the presumption of innocence that's accorded to the defendant. He's already given up his freedom. He's given up his freedom because he's been convicted in another matter. Right. But he has not given up the presumption of innocence that attaches to the instant case. Right. And there have been... And nobody knew about it, that he was shackled, except the judge and the defendant and counsel. Well, I don't think that that excuses a further restraint of his liberty, and this court would be taking, you know, quite a step in a new direction by saying... He wouldn't be taking quite a step in a new direction if we said he couldn't be shackled. It's my contention that he couldn't be shackled because the evidence that was presented at the hearing did not show a necessity for shackling. The Samuels case out of the Fourth Circuit said that not every inmate who is charged with commission of a crime committed in prison who's already an inmate should be subjected to unusual security measures, and this court in Israel v. Harrell followed that. What was he charged with? My client? Yeah. Was charged with multiple Hobbs Act violations. They were violent crimes. For the offense that he was before the court at that time? The current offense, he was charged with being an accessory after the fact to a murder. It carried a maximum penalty of 15 years and was his least serious offense in terms of the potential penalty. My client had made numerous appearances in district court in the underlying case with no problems, had made multiple appearances in this court with no problems, and there had been no threats, outbursts, or disruptions or any indication that his behavior would be problematic in this court. It's our opinion that the district court abused its discretion in ordering shackling. Thank you. Thank you. Thank you. Mr. McCuskey. Good morning and may it please the court, counsel. This court should affirm in all respects as to both defendants there was easily sufficient evidence presented at trial from which any rational jury could conclude that Mr. Bell was guilty of first degree murder and Mr. Dixon was guilty of being an accessory after the fact of the murder. Is it true that there was no evidence whatsoever concerning a motive for attacking Mr. Pendleton? That is correct, Your Honor, but of course motive is not an element. No, no, I just am, I'm, I'm, I'm just. Your Honor, and I don't want to say something that's not in the record, but I can say this, that of course investigations were done, interviews were done, but there was no evidence presented at trial as to any possible motive. That is correct. Did Bell and Dixon have a connection prior to being in prison? If I remember correctly, they both had convictions from Kansas. That's correct, Your Honor. I do not know, and again, I don't believe there was any, any record evidence showing a prior association between those two individuals. And tell me this, was the video recording of the incident, you know, between Bell and that officer used in the prison disciplinary hearing? Speaking of Officer Morris, Your Honor, the video, there was no actual disciplinary proceeding because they expunged the disciplinary matter, and this came up in the hearing, because there was a discrepancy on the officer's report between the cell that he said that the comment came from and evidently Bell's actual cell. So rather than actually having a hearing on that and making a determination, the matter was expunged. And as we set forth in the brief, Your Honor, in the course of the hearing that the district court held on that issue, whether or not to exclude the testimony of Officer Morris, evidence was submitted, BOP employee testimony was given, that the eventual destruction or erasure of that video was in accordance with whatever normal procedure the Bureau of Prison has, Your Honor. And the scanning of the handwritten document produced by Mr. Davis didn't come through evidently because it was scanned and he had written it in pencil and it didn't scan appropriately. But the point, Your Honor, is that the district court found that there was no bad faith on the part of the government, of the prosecution, in the apparent destruction of that evidence. Let me take you somewhere else. Were there any prior incidents with Mr. Dixon when he was outside of the prison during transportation, for example, that suggested he needed to be restrained other than the fact that he was a violent individual? Your Honor, no, there was no evidence. In fact, I do believe that Deputy U.S. Marshall Snyder, who testified at the hearing that the district court held, testified, in fact, that Mr. Dixon had provided no problems in any respect in the various transportations related to this actual incident. But, of course, that wasn't the only evidence available to the district judge. The district judge was aware of his long record of infractions during his incarceration at BOP for his other conviction that put him there in the first place to include infractions for weapons possession, violent threats, sexual misconduct toward female staff. And the district judge made the determination, I think an appropriate determination, that shackling would be appropriate. Restraints would be necessary to maintain the security of the courtroom. And as this court knows, even though counsel is correct, Ms. Cook is correct, that there's a general presumption that a defendant should not be shackled for due process concerns. This court has also made clear that there's got to be some kind of prejudice that comes from shackling. And in this case, the judge made an appropriate determination that shackling would be appropriate here and took steps to make sure that the jury would not become aware of the shackling. And there's nothing in the record to show that there was awareness. No prejudice, in other words. I'd like to turn, Your Honor, back to the evidence. There was some questioning of counsel regarding what the video showed. And Ms. Varner, counsel for Mr. Bell, expressed her view that this was just very sparse evidence to show premeditation. But the words in counsel's brief, and indeed the words in my brief, cannot capture the nuances, the full range of what that video evidence depicted to the jury. We can explain. I can explain. And I did in a brief a little bit of the sequence. And I gather from the questions of this court that the court is very well aware of the essentials of what that video showed. And that is that, in fact, when Mr. Bell walked to cell 105, the cell of the victim, Mr. Pendleton, he did have his hand in his pocket. He did open the cell door across his body using his left hand. The door came open. He went inside. The door closed behind him. And he was in there for around a minute before he came back out. Now, the camera could not capture what happened in the cell. But the evidence that we presented at trial gave a pretty good idea to the jury. And I think the jury was entitled to find that Mr. Pendleton was attacked while he was on the bottom bunk. There were two stab wounds to his back and then the fatal stab wound to the side of his neck. The pools of blood, the photographs of blood that the jury saw could lead to the reasonable inference that this was not a fight. This was not an attempt to go in and rob Mr. Pendleton of something and things got heated and then there was a heat of passion type killing. This was a premeditated killing. And I think also the evidence showed, as the court suggested in his questioning earlier, that there was a common plan or scheme in place that involved both Dixon and Bell, and this was a reasonable inference for the jury to draw based on what appeared to be a choreographed nature to this entire sequence. From the time Bell left the cell and Dixon came out and sat on the unit floor, watched TV, looked in the direction of cell 105 as if waiting, and then, of course, when Bell came back, shirtless, carrying a bloody bundle in his hand, a weapon in the other, he got right up, went right into the cell 103, preceded Bell in there. It wasn't like, oh my gosh, what happened to you? It was a reasonable inference for the jury to conclude that Dixon was waiting for him, he knew what happened in the cell, and then the events afterward were events that were depicted in large part on the video, which was Mr. Dixon helping to obstruct or destroy evidence related to the homicide in assistance of Bell. The final point I'd like to make, Your Honor, is that this counsel made a suggestion that there needed to be more. There needed to be something else showing premeditation. This court has never said that. This court, as far back as the Brown case, has made clear that we can't really know, barring some kind of a confession on the part of an accused murderer of what their thought process. We can't really know what their subjective thought process is, but premeditation is susceptible to proof, and proof is exactly what the jury had here when they saw the video, when they saw the other evidence, and they heard the testimony. And so in challenging the sufficiency of the evidence, I would respectfully conclude, Your Honors, that neither defendant has shown that they can meet the very high burden of showing that there was no way a rational jury could find, beyond a reasonable doubt, all of the essential elements of the charged crimes here and find both defendants guilty as they did. If there are no further questions, I'll go ahead and rest the discussion. Thank you, Mr. Chief. Thank you. Ms. Barr? I said I'd give you a minute. We'll give you two minutes. Thank you. Counsel for the Government talks about a concert of action that happened in this matter and makes much of the fact of Mr. Dixon helping after the fact to dispose of items. Mr. Dixon was not charged in a conspiracy. He was charged as an accessory after the fact. His helping dispose of those items is not evidence of premeditation in this case. Counsel also alluded to the fact that the jury had some sort of special insight from watching these videos. However, I'm here to tell you that if the government had more facts to put it before this court, the government would have. The only facts that we have are that they left the cell together, Dixon sat down, looked in that direction one time. The fact that Mr. Bell carried a weapon does not mean he premeditated a murder when he went into that cell. As the government rightly points out, we could not see what was going on in those cells, neither in the cell where the murder happened nor the cell that Mr. Bell returned to. We are left with very simple facts, no planning activity, and no motive. And on those facts, the jury could not have found beyond a reasonable doubt that Mr. Bell premeditated the murder. If I have one remaining minute here, I'd like to address Mr. Bell's disciplinary action being admitted against him at trial. The district court found no bad faith on the part of the government. However, I just want to point out, as we did in our brief, that I find it stunning that the government alleges no bad faith where they are required for people who are acting on their behalf to make sure that evidence is preserved. In Mr. Bell's case, the first responders, the investigators, the witnesses at trial were all the BOP. We had a disciplinary violation happen. Now, maybe if it had been a different violation, we might not have said, oh, it's not related to the murder, I shouldn't sort of know and contact the U.S. attorney. The whole disciplinary violation was his admission of a murder. And I just find it stunning, like, it's not negligence. In my mind, it's recklessness for which the government should be held responsible that that information was never relayed to the government and those videos preserved. The government admitted at one point that those could impact the belief in the testimony of Officer Morris, but then in their brief said, well, because there was no audio, we couldn't know what happened. Well, we could have seen if that officer stopped or not, and that was Mr. Bell's contention that there was no stop. And for these reasons, we would ask that this court reverse Mr. Bell's conviction. Thank you. Thank you. Thanks to all counsel, and the case will be taken. Oh, I'm sorry. I'm sorry. You had reserves from rebuttal. Just very briefly, I want to return to the issue about the district court's finding of necessity for the shackling of Mr. Dixon. The government originally requested that Mr. Bell be shackled for security reasons and then later amended its request to add Mr. Dixon. And one of the primary reasons for the request that Mr. Dixon be shackled came from the U.S. Marshals Service, which indicated that they wanted Mr. Dixon shackled so that there would not be some asymmetry of restraint between the two defendants. But the district judge said he did not rely on what the U.S. Marshals had requested in coming to his decision. Yes. The district court relied on Mr. Dixon's, primarily relied on Mr. Dixon's prior criminal conviction for which he stood trial without restraints and without incident, and his disciplinary problems within the institution, which did not follow him into the courtroom on any of his prior court appearances. The marshal testified that during the transports there were no threats, no disagreements, no problems whatsoever. So there was no evidence before the district court judge that would indicate that Mr. Dixon was likely to be a security threat or be disruptive in the courtroom. And because of that, we believe that it was not necessary either for the security or the decorum of the courtroom for him to be shackled. We would ask that the court reverse the judgment of conviction. Thank you. Thank you. Now thanks to all counsel and the case will be taken under advisement.